UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry E. WEBB, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Mary Edith STOKELY, Defendant-Appellant.

Nos. 16494, 16495.

United States Court of Appeals
Sixth Circuit.

April 21, 1966.

John F. Dugger, Morristown, Tenn., on the brief; Bacon & Dugger, Morristown, Tenn., of counsel, for appellants.

Moss Noble, Lexington, Ky. (George I. Cline, U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before PHILLIPS, EDWARDS and CELEBREZZE, Circuit Judges.

EDWARDS, Circuit Judge.

These are appeals from jury verdicts of guilty on indictments charging federal liquor law violations. Count One charged violation of 18 U.S.C. § 371 by conspiring to possess and transport 150 gallons of non-tax-paid whiskey. Count Two charged violation of 26 U.S.C. § 5205(a) (2) by possession and transportation of said whiskey. Defendant Webb was convicted on both counts. Defendant Stokely was convicted on the conspiracy count only.

The principal question in the case is whether or not the proofs which were offered were legally sufficient to sustain the convictions of appellants.

These facts are in the record. Both defendants were from Cocke County, Tennessee. Defendant Webb was in the used car business and regularly drove to Cleveland to pick up cars and transport them south. Defendant sold to one Plemmons two 1956 Chryslers, one in October 1963, and one on February 21, 1964. Ultimately 150 gallons of whiskey was found in the second of these 1956 Chryslers.

Government agents testified that on January 19, 1964, Plemmons and Webb (with Stokely) were seen together in an Amoco gas station in Lexington. Webb and Plemmons were working on the first of Plemmons' Chryslers, taking off heavy duty rear springs. The evidence bearing on the conspiracy charge pertaining to this date was supplied chiefly by a Treasury agent named Guernsey:

"A   As a result of this call, I went out on New Circle Road—that is in Fayette County—to the vicinity of 647 New Circle Road, the American Oil Station. I arrived there at approximately 2:30 p. m. Upon arriving I observed a 1964 Pontiac, Bonneville, bearing Tennesssee dealer plate 46D25. This car was occupied by Larry Webb and Mary Edith Stokely.

"Q   Who was driving?

"A   Larry Webb.

"Q   Where was Mary Edith Stokely sitting?

"A   The passenger side."

\*     \*     \*     \*     \*     \*

"A   At approximately the same time, the '56 white Chrysler drove into the station and pulled onto the grease rack.

"Q   Now, were you able to observe the license of that Chrysler?

"A   It was Ohio 8770–AB."

\*     \*     \*     \*     \*     \*

"Q   Did you see who was driving the 1956 white Chrysler?

"A   Donald Leroy Plemmons."

\*     \*     \*     \*     \*     \*

"Q  Go ahead and tell us what you saw after that?

"A  Saw the white Chrysler upon the grease rack. I was in the office approximately 10, 15 feet from the Chrysler."

\*    \*    \*    \*    \*    \*

"A  Mary Edith Stokely was in the office there and another lady and the service station operator, out under the '56 Chrysler I saw Larry Webb and Plemmons.

"Q  What were they doing?

"A  Working on the rear of the vehicle. A little later, a few minutes later, I saw Larry Webb with an overload spring in his hand.

"Q  Would you describe that to us, please?

"A  The spring is—it is a coil spring, commonly used on vehicles carrying heavy loads, particularly on whiskey loads. It is installed on the rear, on the rear springs of the vehicle.

"Q  What occurred after that?

"A  Webb walked to the rear of the vehicle. I could notice the trunk lid being up, however, I could not see in—what they were doing right at the very rear of the vehicle. He came back without the coil spring, Webb did, took some wrenches to the glove compartment of the '56 white Chrysler.

"Q  Had the car been lowered at that time?

"A  Yes, sir, it had been. When I first observed the coil spring, the car was still on the rack, with the rack raised.

"Q  What did Webb do with these wrenches?

"A  Placed them in the glove box of the Chrysler.

"Q  What at that time happened?

"A  Plemmons then walked out to the '64 Pontiac and from the passenger side obtained some license plates, took—

"Q  From where on the passenger side?

"A  From under the seat.

"Q  Did you see those license plates?

"A  I saw the plates, however, I didn't read the numbers at that particular time.

"Q  Did you see them at a later time?

"A  I did.

"Q  So that you can tell us the number, if you were able to see them?

"A  '63 Tennessee, 445627.

"Q  Where did you see that plate?

"A  This plate on the same '56 Chrysler.

"Q  By whom had it been placed on the '56 Chrysler?

"A  I am not certain. The only person in the station or on the grease rack at that time was Plemmons.

"Q  Had the Ohio license which you saw on the vehicle when it pulled into the service station been removed?

"A  They had.

"Q  All right. Go ahead, then what occurred? Then what happened?

"A  Larry Webb came—was in the station with Mary Edith Stokely, paid a bill, he asked the operator how much he owed, he paid a bill in the amount of $11.07. At that time I left the station, got in my car."

\*    \*    \*    \*    \*    \*

"Q  Mr. Guernsey, have you had occasion to determine the telephone number of the service station about which you have just testified?

"A  I have."

\*    \*    \*    \*    \*    \*

"Q  Would you tell us the number, if you know, of that service station?

"A  299–9995."

No whiskey was found in connection with the January 19 trip. But the second issue in the case pertains to government testimony (objected to and stricken) to the effect that on that trip Webb was seen talking to a person in Covington identified by government counsel and witnesses as a known bootlegger. And the evidence also identified this first Chrysler as having been seen in the parking lot

of the A–1 Liquor Store in Covington, Kentucky (of which more below).

On still another trip on February 23, 1964, Webb and Stokely were seen riding in the same Pontiace along Route I–75 heading north about 100 yards ahead of the second of Plemmons' 1956 Chryslers, which Plemmons was driving. Stokely was driving the Pontiac. Shortly thereafter the Pontiac speeded up and proceeded to Covington, Kentucky, where it pulled into a parking lot at the A–1 Liquor Store. The Chrysler arrived a few minutes later and parked nearby. The testimony indicated that the cars were 15–20 feet apart, with no other cars close by.

Subsequently, federal agents approached the Chrysler, saw in it two cases of whiskey on the floor of the back seat,[1] and arrested all the people concerned, including Webb and Stokely. Subsequently, they searched the trunk of the Chrysler and found a total of 150 gallons.

The 1956 Chrysler in which the whiskey was found (very similar in appearance to the first 1956 Chrysler) had on it Ohio plates previously issued to and carried by the other 1956 Chrysler, which had been observed in the January 19, 1964, episode. It also had oversized rear springs.

When he was arrested, Webb was in the Daniel Boone Bar, approximately 100 yards away from the parking lot where the two cars were located and within view of them. He was drinking beer with Donald Plemmons, driver of the whiskey car, and Jay V. Ball, who had ridden to Covington with Webb in the Pontiac. Both of these men were defendants in the trial below. Ball was acquitted; Plemmons was convicted on both counts but is not an appellant here.

Treasury Agent Rowe testified as to the events of the arrest:

"Q Did you have any conversation with Larry Webb or either of the other men that you saw there?

"A I approached Larry Webb and identified myself as a federal officer and asked him if his name was Larry Webb and at that time he stated that it was not. I asked him a second time if it wasn't true that his name was Larry Webb and he denied it and as I turned to talk to one of the other two men standing there, Mr. Webb said, 'That is correct. My name is Larry Webb.'

"Q Did you make any revelation to him at that time as to what your business was?

"A We informed him that we had seized his vehicle, seized the 1956 Chrysler, and a hundred gallons of moonshine across the street and that he was under arrest."

\* \* \* \* \* \*

"A \* \* \* I told Larry Webb and the other defendants to empty their pockets and to place everything on the hood of one of the cars that was setting there. I am not sure which one. And at that time Larry Webb reached in with his thumb and forefinger of his right hand and drew out a loaded .32 caliber Smith & Wesson revolver."

Webb testified that he had agreed to meet Plemmons at the A–1 Liquor Store and drive him to Cleveland, but that he know nothing about the whiskey. He also flatly denied that Plemmons was at the Amoco station with him on January 19, 1964. He claimed he carried the gun for protection on his used car buying trips.

The government contends that Webb was convoying the whiskey when seen on Interstate 75 and that he was "arrested at Covington, Kentucky, in possession of 150 gallons of moonshine whiskey." The government also contends that there is ample evidence of "a brilliantly conceived and highly organized operation" so as to support the conspiracy convictions of Webb and Stokely.

On review of a conviction based on jury verdict, our court does not, of course, weigh disputes in evidence, but

---

1. The facts testified to by the agent were such as to convince him and the court that the whiskey was non-tax-paid. No issue is presented as to the seizure on this appeal.

views the disputed facts (and proper inferences therefrom) from the point of view favorable to the government which accords with the jury decision. Zottarelli v. United States, 20 F.2d 795 (C.A. 6, 1927), cert. denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927); Holmes v. United States, 134 F.2d 125 (C.A. 8, 1943), cert. denied, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943); Isaacs v. United States, 301 F.2d 706 (C.A. 8, 1962), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

We will deal first with Webb's conviction for possessing and transporting non-tax-paid liquor. We believe Webb's conviction on this count must be set aside. No whiskey was ever found in an automobile owned by Webb or driven by him or in which he was riding. We are cited no proof of an act of Webb which amounted to an exercise of dominion over the 150 gallons of whiskey found in Plemmons' second Chrysler.

■■ While Webb's Pontiac was observed 100 yards ahead of the Plemmons whiskey car, there is no evidence that the two cars stayed together for any appreciable time. While there is testimony from which the jury might have found that Webb was still in the A–1 Liquor Store parking lot when Plemmons arrived (Webb denied this) and hence the jury might perhaps have inferred that Webb knew of the whiskey in the back seat of Plemmons' car, such knowledge would not of itself represent an act of possession or transportation. McFarland v. United States, 273 F.2d 417 (C.A. 5, 1960); McClain v. United States, 224 F.2d 522 (C.A. 5, 1955).

■ The jury found Mary Edith Stokely not guilty on the possession and transportation count; but it found her guilty of conspiracy. We reverse this conviction also. The evidence puts defendant Stokely on the scene of events which positively or by fair inference could be deemed a part of a moonshine liquor distribution conspiracy. But this record is devoid of any testimony which links defendant Stokely to any integral element of such a plan, except by presence and association. She was on the scene during the events at the Amoco station on January 19, 1964, and during the events of February 23, 1964. But the closest the evidence comes to showing agreement to or participation in such a plan is the fact that she drove the Pontiac on February 23. No whiskey was transported in this car, however, and we cannot agree with the government that the testimony was sufficient to establish the "convoy" theory.

The government brief states flatly that "Webb and Stokely were the financial backers of the enterprise." This may be true, and government counsel may know that it is true, but we are not cited a scintilla of evidence from this record to support this assertion.

■ Defendant Stokely's unexplained presence during such a series of suspicious events might well justify grave doubts about her role. But neither association with conspirators nor knowledge that something illegal is going on by themselves constitute proofs of participation in a conspiracy. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); United States v. Potash, 118 F.2d 54 (C.A. 2, 1941), cert. denied, 313 U.S. 584, 61 S.Ct. 1103, 85 L.Ed. 1540 (1941).

■ The evidence of conspiracy—even if circumstantial—must be such as to establish beyond reasonable doubt defendant's agreement to or participation in a plan to violate the law. Viewing the proofs from the point of view favorable to the government, which is represented in the jury's verdict, we find no evidence to establish defendant Stokely's agreement to or participation in a conspiracy to possess or transport non-tax-paid whiskey. United States v. Grimes, 332 F.2d 1014 (C.A. 6, 1964); Dennert v. United States, 147 F.2d 286 (C.A. 6, 1945).

■ As to defendant Webb's conviction on the conspiracy count, however, we have another matter. As we have noted, no government evidence definitely established any act of dominion over non-tax-paid whiskey on his part. Cf. United

States v. Anderson, 352 F.2d 500 (C.A. 6, 1965). Nor do we find any testimony specifically describing his agreement to the scheme (or his conception of it!).

But in Webb's case we do find acts from which participation in and agreement to a plan for possessing and transporting non-tax-paid whiskey might properly be inferred.

The striking parallels between the modus operandi employed by Plemmons on February 23 when he drove a load of whiskey to Covington which was seized and the modus operandi employed by him on January 19 are such as to allow the jury to infer that the events of January 19 represented the return leg of another Cocke County, Tennessee to Covington, Kentucky, moonshine liquor trip.

With the Chrysler free of whiskey, Webb apparently felt safe in assisting in dismounting the overload springs, in carrying the substitute Tennessee plates in his car, and in paying the garage charges at the Amoco station. The jury properly could have found or inferred that these acts were acts done in concert by conspirators toward a common illegal design. See American Tobacco Co. v. United States, 147 F.2d 93, 107 (C.A. 6, 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L. Ed. 1575 (1946).

In the same category are the facts that defendant Webb, when arrested on February 23, was found in possession of a loaded revolver; that one of the persons who accompanied him to Covington in his Pontiac was found in possession of the key to the Chrysler trunk (where most of the non-tax-paid whiskey was discovered); and that he and Plemmons both had in their pockets memos of the telephone number of the Amoco gas station where they had been observed on January 19.

All of these facts are supplementary to the evidence of presence and proximity and association which taken alone in defendant Stokely's case we held insufficient to establish conspiracy.

This Court has said:

"Circumstantial evidence, if strong enough to convince the trier of the facts of a defendant's guilt beyond a reasonable doubt, is sufficient to sustain a finding of guilt. Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Comer, 288 F.2d 174, 175, C.A. 6th., cert. denied, 366 U.S. 925, 81 S.Ct. 1351, 6 L.Ed.2d 384." United States v. Burch, 313 F.2d 628, 629 (C.A. 6, 1963).

And the United States Supreme Court has detailed the rationale behind the circumstantial evidence rule pertaining to conspiracies:

"Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details * * *." Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947).

We hold that the proofs as to defendant Webb constituted circumstantial evidence from which the jury properly could have found beyond reasonable doubt that he agreed to and participated in a conspiracy to possess and transport non-tax-paid whiskey. United States v. Anderson, supra; American Tobacco Co. v. United States, supra; Blumenthal v. United States, 158 F.2d 883 (C.A. 9, 1946), rehearing denied, 158 F.2d 762 (C.A. 9, 1947), aff'd, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Miller, 358 F.2d 696 (C.A. 6, 1966).

Careful consideration of this record discloses no other error in judicial rulings or the jury charge.

Government counsel and one government witness were overeager to define the role of the person whom Webb and Plemmons contacted in Covington on January 19. The District Judge sustained objections to the proffer of hearsay description of that role and told the jury to disregard it. No motion for mistrial on grounds of prejudice was made then, nor are we

persuaded from this whole record that such prejudice resulted. We find no error affecting substantial rights of defendant Webb. Rule 52 Fed.R.Crim.P.

The conviction of defendant Stokely on Count One is reversed, the sentence is vacated, and the case is remanded to the District Court for entry of a judgment of acquittal.

The conviction of defendant Webb on Count Two is reversed, the sentence is vacated, and the case is remanded to the District Court for entry of judgment of acquittal.

The conviction and sentence of defendant Webb on Count One is affirmed.